**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

United Specialty Insurance Company,

             Plaintiff,

v.

Dorn Homes Incorporated,

             Defendant.

No. CV-18-08092-PCT-MTL

**ORDER**

Before the Court are the parties' motions for partial summary judgment. As described herein, Defendant/Counterclaimant Dorn Homes Inc.'s ("Dorn") motion is granted and part and denied in part. (Doc. 168.) Plaintiff/Counter-defendant United Specialty Insurance Company's ("USIC") motion is denied. (Doc. 169.) Dorn also filed a *Daubert* motion to exclude the testimony USIC's rebuttal expert. That motion is granted in part and denied without prejudice in part.

## I.    BACKGROUND FACTS

The following facts are not disputed. USIC is an insurance company. Dorn is a residential home developer. Dorn developed Quailwood, a 350-single family residential home division, in Prescott Valley, Arizona beginning in 2012. Dorn did not perform the actual construction at Quailwood, but instead contracted with various subcontractors. USIC issued six consecutive one-year Commercial General Liability Policies (the "CGL Policies") to Dorn in connection with the construction of Quailwood.[1] The CGL policies

---

[1] The CGL policy numbers were BTO1315995; BTO1426614; BTO1537485;

were effective from February 2, 2013 through February 2, 2019.

In 2017, Dorn began to receive complaints from homeowners about interior damage to Quailwood homes. Dorn first hired a structural engineering firm, Mooradian & Associates, to perform an inspection and issue a report. The resulting April 5, 2017 report determined that an insufficient number of vents, as well as vents blocked by attic insulation, resulted in "roof truss uplift." (Doc. 168-2 at 13-14.) Roof truss uplift occurs when the "bottom chord" of the roof truss is exposed to different temperatures or moisture levels than the rest of the roof truss, ultimately resulting in an arching of the roof truss. The Mooradian & Associates report concluded that roof truss uplift caused interior wall cracking in at least one Quailwood home. It also stated that there was no apparent floor or foundation damage.

Dorn tendered the interior cracking and wall separation claims to USIC on May 16, 2017. National Claims Services, Inc. ("NCS"), USIC's third-party administrator, acknowledged receipt of Dorn's tender on May 18, 2017, and assigned claims adjuster William Fisher to handle the claim.[2] The resulting May 31, 2017 claim report states that the claim "currently involves 38 homes in the Quailwood subdivision." (Doc. 168-2 at 21.)

USIC hired an engineering firm, Envista Forensics, to examine the homes and prepare a report. The June 17, 2020 report states that the issues in the homes, including cracking and baseboard separation, were consistent with "cyclical vertical displacement of the roof trusses"—that is, roof truss uplift. (*Id*. at 76.) It states that the roof truss uplift was caused by "installation deficiencies of the roof and/or wall framing systems" and/or "installation deficiencies in the blown-in cellulose insulation." (*Id*.) This finding was consistent with the Mooradian & Associates report. The Envista Forensics report also states, "[r]egardless, a floor elevation should still be performed to ensure that the damage was not associated with the differential movement of the foundation and/or deficiencies

---

BTO1648154; ATN-SF1750207; and ATN-SF1861501.They were each effective for one year.

[2] Mr. Fisher was supervised by Thomas Brown, whose own supervisor was Henrietta Hinojosa.

1   related to the design/construction of the foundation system." (*Id*. at 79.) This was the first

2   finding of potential issues with the home foundations.

3         Dorn ultimately installed an unvented foam insulated roof system into the affected

4   homes to address these issues. It did not install additional vents or unblock the existing

5   vents. Dorn states that it decided against "repair[ing] the faulty workmanship of its

6   contractors by unblocking vents or installing additional vents because it would not have

7   been efficient and may not have been effective." (Doc. 168 at 5.) Dorn sent invoices to

8   USIC for both the new foam insulation roof system and interior repairs for the cracking

9   and separation in September and October 2017.

10         Based on Envista Forensics' recommendation to evaluate foundation movement,

11   Dorn also hired another engineering firm, the Felten Group, to investigate the foundation

12   issues in September 2017. The Felten Group report acknowledged that a prior report stated

13   that truss arching "was responsible for the interior distress in this home." (Doc. 168-3 at

14   104.) The report writer identified another concern, stating, "I believe that post-construction

15   foundation movement is responsible for a portion of the distress inside the home." (*Id.* at

16   104.) The foundation movement was caused by "expansive soils around and under the edge

17   of the foundation increase in moisture content." (*Id*.) The result was "foundation edge lift."

18   The report also recommended that various measures be taken to "reduce the risk of future

19   foundation edge lift"; that Dorn consult with a geotechnical engineer before conducting the

20   remedial measures; and that another inspection occur six months after any remedial

21   measures. (*Id*.)

22         Subsequently, the Peterson Geotechnical Group ("Peterson"), another engineering

23   firm, performed a forensic geotechnical evaluation of 91 Quailwood homes between

24   September 2017 and March 2018. Its report, dated June 20, 2018, cites evidence that

25   foundation edge lift in the "majority" of the homes caused "resulting damage." (Doc. 168-

26   3 at 114-15.) It also states that "the drainage swales, which convey the drainage away from

27   the home and off the lot, were not constructed properly." (*Id*. at 116.) The drainage swales

28   lacked sufficient slope to carry runoff from the homes, which in "many cases . . . caused

surface runoff to pond within drainage wales, near the foundation of the home." (*Id.*) The Peterson report issued various recommendations to address these issues. These included removal and replacement of decorative landscaping gravel within the draining swales; removal and replacement of existing corrugated drain lines; re-grading of "large areas of the lots" to create positive slope away from the homes; installation of drain collection boxes and solid piping; installation of retaining walls; the addition of gutter shields; modification or removal of certain flatwork and planters; and removal of plants and shrubs located within five feet of the homes. (*Id.* at 116-17.) Dorn engaged landscaping companies to perform the repairs.

Peterson observed additional issues during the repairs. For example, the exposed drain lines were revealed to have been installed "with undulations (rather than at a consistent downwards slope) resulting in ponded water within the pipe sections." (*Id.* at 117.) The drain connections were also "not watertight and in some cases secured with duct tape." (*Id.*) The result was "ponded" water that seeped into the soils adjacent to the foundation, triggering expansive soil movement and damage to the residences.[3] Peterson also observed that some of the backfill soil used against the foundation was a "sandy or gravelly soil" that was "highly permeable and allowed surface drainage to migrate into the foundation soils," triggering soil movement and damage. (*Id.* at 117-18.) Further, the paver sidewalks connecting the home entries to the driveways "had a reverse slope towards the residence causing the draining to flow back towards the foundation." (*Id.* at 118.) Peterson also noted landscape mounds that directed drainage back to the homes.

Dorn ultimately paid for repairs to the 87 Quailwood homes at issue. Mr. Fisher, the claim adjuster, emailed Ellen Carpenter, Dorn's COO and CFO, on August 11, 2017, to "check[] in to see how the repairs are going." (Doc. 168-3 at 138.) He stated that he would need "individual invoices for each home and proof of payment for each home." (*Id.*) He

---

[3] David Grounds, the CEO of Dorn, stated in his deposition that some of "[t]hose pipes were compromised, crushed" by subcontractors' equipment while performing other work. (*Id.* at 56.) The Peterson report does not indicate that the pipes were crushed.

checked in again one month later. (*Id.*) Dorn provided reimbursement requests to USIC from September 2017 through January 2018. On November 17, 2017, Mr. Fisher notified Dorn that the "cost of replacing the insulation is likely not considered to be property damage under the policy." (Doc. 168-3 at 144.)

USIC ultimately hired its own coverage counsel and requested that Dorn submit information on five of the 87 homes for adjustment. After coverage counsel reviewed the five homes, USIC filed the present declaratory relief action.

## II.    PROCEDURAL HISTORY

USIC filed its Complaint for declaratory relief against Dorn on May 2, 2018. (Doc. 13.) The Complaint alleges that USIC has "no obligation" to indemnify Dorn for its costs and expenses, "or certain portions thereof," based on enumerated contractual terms and exclusions. (*Id.* ¶ 32.) Specifically, USIC argues that there was no "occurrence" or "property damage" under the CGL Policies, and that Exclusions L, M, N, J(5), and J(6) bar coverage in this case. The following month, Dorn filed a counterclaim against USIC with claims of bad faith, breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty, estoppel, waiver, unjust enrichment. (Doc. 10.)

On January 31, 2020, Dorn filed its Motion to Exclude Opinion of Steven Plitt Under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) (Doc. 147). USIC filed a response on February 14 (Doc. 164); Dorn filed a reply on February 21. (Doc. 165.) On February 28, both parties filed their respective motions for partial summary judgment. (Docs. 168, 169.) They filed their responses on April 13. (Docs. 173, 174.)  The motions are now fully briefed. (Docs. 177, 179.)

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect

the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (internal citations omitted); *see also Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted).

## IV. DISCUSSION

### A. Dorn's Motion (Doc. 168)

Dorn moves for partial summary judgment on liability. It argues that all of its claims are covered by the CGL Policies, with the amount of damages to be determined at trial. Dorn specifically argues that its damages are covered "occurrences" as damages resulting from subcontractor faulty workmanship, the faulty workmanship itself, measures taken to prevent future damage ("preventative measures"), or a combination thereof; and that none of the policy exclusions cited in USIC's complaint apply in this case. As discussed below, the Court finds that the parties have presented genuine issues of material fact with respect to the "occurrences" arguments, but concludes that Dorn is entitled to summary judgment with respect to Exclusions J(5), J(6), K, and M.

#### 1. Resulting Damage as "Occurrence"

Dorn first argues that all of the damages resulting from subcontractor faulty workmanship are covered as "occurrences" under the CGL Policies. The interpretation of an insurance contract is a question of law.[4] *See Wilshire Ins. Co. v. S.A.*, 224 Ariz. 97, 227 (App. 2010). Courts interpret insurance policies according to their plain and ordinary meaning. *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 200 ¶ 14 (App. 2010). The insured has the burden of establishing coverage under an insuring clause. *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46 ¶ 13 (App. 2000). The insurer has the burden of proving the applicability of any exclusion. *Id.*

---

[4] The parties agree that Arizona law applies to this case because Arizona has the most significant relationship to the parties and the transaction. *Cardon v. Cotton Lane Holdings, Inc.*, 841 P.2d 198, 202 (Ariz. 1992).

The CGL Policies provide coverage for "those sums that [Dorn] becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." (Doc. 1. at 4 ¶ 17, *et al.*) Coverage exists if the "'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'" and "occurs during the policy period." (*Id.*) "Property damage" is "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it." (*Id.* at 6 ¶ 19, *et al.*) An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*)

Under Arizona law, "mere faulty workmanship, standing alone, cannot constitute an occurrence as defined in the policy, nor would the cost of repairing the defect constitute property damages."[5] *U.S. Fid. & Guar. Corp. v. Advance Roofing & Supply Co.*, 163 Ariz. 476, 482 (App. 1989) (hereinafter, "*Advance Roofing*"). Subsequent court decisions, however, have distinguished between "faulty workmanship standing alone and faulty workmanship that causes damage to property." *Lennar Corp. v. Auto-Owners Ins. Co.*, 214 Ariz. 255, 262 ¶ 17 (App. 2007) (citing *Advance Roofing*, 163 Ariz. at 482). Where an insured "do[es] not claim faulty work alone," but also that "property damage resulted from the faulty work," that is sufficient to allege an "occurrence." *Lennar Corp.*, 214 Ariz. at 262 ¶ 20. *See also Desert Mountain*, 236 P.3d at 438 ¶ 75 (homebuilder "could not recover the costs of repairing defective workmanship . . . but could recover the costs of repairing property damaged by the defective work"). USIC does not dispute this rule, stating that under Arizona law, "the only damages that are covered under CGL policies are the expenses incurred to repair the property damage that resulted from faulty workmanship, not the expenses incurred to repair the faulty workmanship." (Doc 174 at 13.)

---

[5] The policy at issue in *Advance Roofing* defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured." *Id.* at 481. This definition differs slightly from the from the CGL Policies in this case, in which an "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 6 ¶ 19, *et al.*)

The first issue, then, is whether the repairs were to faulty workmanship alone or, rather, repairs to damages resulting from faulty workmanship. Both parties assert that their respective positions are undisputed. Dorn states, "[w]hether caused by subcontractors' faulty workmanship or accident, there can be no dispute that the attic ventilation issues and drainage issues caused both the attic trusses and foundations to shift from their correct positions and thus alter them in a 'material dimension,' causing other damage to the homes." ((Doc. 168 at 14-15) (citation omitted). Dorn further states that there can "be no dispute that all of the measures Dorn took . . . were aimed at ensuring that the trusses and foundations were placed 'back into their correct positions thereby repairing the components rather than (or in addition to) stabilizing them so they would incur no additional damage.'" (*Id.*) (citing *Desert Mountain*, 236 P.3d at 438-39 ¶ 76). USIC, for its part, asserts that it is "undisputed that the missing roof vents and improperly installed cellulose insulation were the direct result of faulty workmanship of Dorn's subcontractors," and that the corrective measures taken with respect to the attic "repaired only that faulty workmanship." (Doc. 174-1.) USIC also asserts that it is "undisputed" that the grading and draining repairs were the "direct result of the faulty workmanship of Dorn's subcontractors." The Court finds that the parties have presented genuine disputes of material fact as to whether the repairs are covered "occurrences" under the CGL Policies.

### a.     Attic Issues

With respect to the roof issues, Dorn states that Mooradian & Associates determined that roof truss uplift was "the cause of the cracking/separation issues in the house." (Doc. 168-2 at 14.) As noted, Dorn did not unblock existing vents or install additional vents. (*Id.*) Instead, it removed the cellulose insulation and installed an unvented spray foam insulated roof system on the underside of the roof deck. David Grounds, the CEO of Dorn, stated in his deposition that Dorn elected this method because "we made the judgment that it would be quicker, the probability of success much higher and actually less expensive to do the spray foam." (Doc. 174-1 at 7.) In this sense, Dorn asserts that these remediation efforts were not to fix the subcontractors' faulty work itself, but rather to fix the resulting damages

to the trusses and to prevent further damage from occurring. Dorn does not concede that any of its repairs were "pure faulty workmanship." Instead, Dorn intended to "repair resultant damage and prevent damage from occurring . . . with only incidental repair to faulty workmanship." (Doc. 168 at 15 n.8.)

USIC asserts, however, that the attic remediation efforts were an "alternative method" to repair the subcontractor faulty workmanship. (Doc. 174 at 14.) USIC notes that when asked whether the spray-in foam was "just an alternative method to achieving the same goal as removing the cellulose, cutting in more O'Hagin vents, and putting the cellulose back in," Mr. Grounds responded that Dorn "thought it would be a more effective way to solve a problem." (Doc. 168-3 at 51.) Further, Mr. Grounds stated, "[i]t's hard to know exactly how much of the problem is truss uplift." (Doc. 168-3 at 69.) USIC also notes that "[d]espite the term 'roof truss uplift,' no damage occurred nor w[ere] any repairs made to any roof truss or structural component" in any of the homes. (Doc. 174 at 3.) USIC also points to the Felten Engineering Group's report, which did not independently acknowledge issues with the attic, but instead attributed "a portion of the distress inside the home" to "post-construction foundation movement." (Doc. 174-1 at 32.) Further, structural engineer Brian Juedes, who wrote the Felten report, stated in his deposition that he "did not see any evidence of roof truss uplift" and that that "I don't believe there was any distress caused by roof truss uplift because I didn't see any evidence of roof truss uplift." (*Id.* at 48, 51.)

At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The Court finds that there is a genuine dispute of material fact as to whether Dorn's attic remediation issues were for the purpose of repairing faulty workmanship itself, or to damage *resulting* from the faulty workmanship. The Court will not grant summary judgment regarding the attic issue.

### b. Grading and Draining Issues

With respect to the grading and drainage issues, Dorn argues that all of the remediation efforts were taken to fix the "foundation edge uplift" issue and to prevent

further damage to the homes from expansive soils. Dorn notes that structural engineer Brian Juedes advised that foundation edge lift was responsible for the distress in some of the homes. Dorn took various repair efforts because otherwise, "the expansive soils would continue to uplift and skew the foundation of the homes as they swelled and shrank, preventing proper settling." (Doc. 168 at 6.) Dorn cites Mr. Ground's deposition testimony that as the foundation slabs began to edge lift, "massive disruption occurs inside the homes with baseboards separating, walls separating, ceilings separating, cracks, doors that were crooked." (Doc. 168-3 at 17.) Mr. Grounds also wrote a letter to Mr. Fisher stating that the Peterson Geotechnical Group report revealed that "[a]t each home, defective construction by subcontractors caused resultant damage to the homes." (Doc. 174-1 at 39.) Engineer Curt Peterson also stated in his deposition, "we weren't just making repairs to construct faulty workmanship because it was faulty workmanship. . . . We did it because it was causing problems and it was causing resulting damage. And so we did it to correct that and also correct the future problems." (Doc. 168-3 at 135.)

USIC's position is that these repairs were all to the faulty workmanship itself. USIC asserts that the various repairs, including the removal and replacement of landscaping gravel, the removal and replacement of drain lines, the regrading of lots, and modification and removal of plants were the "direct result of" and repairs to the faulty workmanship of Dorn's subcontractors. (Doc. 174 at 14.) For example, USIC notes that "no damage occurred nor were any repairs made to the foundation slabs or any structural components[.]" (Doc. 174 at 4.) Further, an analysis and report prepared by O'Donnell Consulting, Inc. for USIC states that the "grading, drainage, landscaping and attic vent repairs identified as 10 separate items within this report were made to correct the faulty workmanship at the time of construction as opposed to correcting the resultant damages." (Doc. 174-3 at 12.)

USIC further emphasizes that corrective measures did not repair any of what it terms the "Resulting Damages," defined by USIC as "distress damage, which included interior drywall and lid line cracks, separations between baseboards and flooring, racking of

windows and doors, nail pops, exterior stucco cracks, separations between cabinets and walls, separations between exterior stucco walls and drywall ceilings, and tile cracks." (Doc. 174 at 2.) These items all relate to the cracking or other damage to the interior of the homes and exterior stucco. For example, USIC cites to deposition testimony from engineer Curt Peterson, who agreed that his "repair recommendations addressed the causal factor that created the stress damage to the homes." (*Id.* at 87.) When pressed whether his "repairs themselves did not remediate or fix the actual cracks in the wall and cracks in the floor and racking of the windows and doors, correct?," Mr. Peterson responded, "Well, that's the cosmetic portion after you address the underlying cause." (Doc. 174-2 at 41.) James C. Harrison of Dorn also stated that after the exterior grading and draining issues were fixed, then Dorn later fixed the inside of the homes. (*Id.* at 11.)

In this regard, the parties disagree as to whether the "resulting damages" are limited to the interior and exterior cracking, or whether the foundation edge lift and related issues *themselves* constitute resulting damages. Dorn emphasizes in its reply that USIC takes too narrow of a view of resulting damages. Dorn's position is that "it makes no sense to think about the interior and foundation and truss damages in a vacuum because they did not occur in a vacuum. The interior damage to the homes occurred simultaneously with, and is inexplicably connected to, foundation edge lift and truss uplift." (Doc. 177 at 11.) USIC asserts, however, that only the interior cracking and related issues constitute resulting damages because, again, no damage or actual repair occurred to the foundations, trusses, or any structural component of the homes.

Here, as well, the Court finds the parties to have presented more than the "mere existence of some alleged factual dispute." *Anderson*, 477 U.S. at 248. The Court notes that, when engineer Curt Peterson was asked in his deposition whether "all of [his] repair recommendations" were "performed for the purpose to repair the faulty workmanship that was performed at the time of the original construction?," he replied:

> I just don't like the term all. . . . And the reason I -- I mean, yes, it was. It was -- I mean, in one hand, yes. The repairs, not

1
2
3
4

> all, but they were done to address the workmanship issues. But
> clearly, we had some concerns, as I talked about earlier, about
> potentially, some of the design aspects of it. And we wanted to
> make sure that by getting as much of this water away as
> possible, that that would satisfy that as well.

5
6
7
8
9
10
11
12
13

(Doc. 174-2 at 39-40.) As Mr. Peterson, who performed extensive analysis of the Quailwood homes, could not directly answer this question, the Court does not intend to, either, at the summary judgment stage. The parties have presented a genuine dispute of material fact as to whether the cracking and related issues inside the homes (and exterior stucco) were the only resulting damages in this case. Further, even were the Court to accept Dorn's position that the foundation edge lift constituted resulting damages, there is nonetheless a material dispute as to what portions, if any, of the numerous repairs were related to those resulting damages. For these reasons, the Court will deny summary judgment on the resulting damages issue.

14

### 2.      Subcontractor Faulty Workmanship as "Occurrence"

15
16
17
18
19
20
21
22

Dorn also argues that the Court should find, as a matter of first impression, that subcontractor faulty workmanship standing alone constitutes an "occurrence" under the current version of the CGL Policies. Dorn argues that the standard policy language has changed since the *Advance Roofing* and *Lennar* decisions; that the Arizona Court of Appeals has already found subcontractor faulty workmanship to be an "accident" from the insured's perspective, and that "Exclusion L" to the CGL Policies contains a specific exception for subcontractor work. As described below, the Court is not convinced by these arguments.

23

### a.      *Advance Roofing*

24
25
26
27
28

As Dorn notes, in *Advance Roofing*, the Arizona Court of Appeals considered a declaratory action brought by an insurer arising out of a prior version of the standard CGL policy. The insured, a roofing company, faced a breach of contract claim (among others) from a homeowner's association. No subcontractor work was at issue in *Advance Roofing*. As noted, the Court of Appeals ultimately held that "mere faulty workmanship, standing

alone, cannot constitute an occurrence as defined in the policy, nor would the cost of repairing the defect constitute property damages." *Id*. at 482. Dorn argues that this is less instructive than other, more recent cases, because the policy at issue contained "business risk" exclusions that are not present in the CGL Policies in this case. The exclusions precluded coverage for subcontractor faulty workmanship absent a specific endorsement. (Doc. 168 at 15.) However, the court specifically stated that it "f[ou]nd it unnecessary to consider" the "business risk" exclusions. *Advance Roofing*, 163 Ariz. at 479. The court also noted that the interpretation of the "business risk" exclusion and the "threshold question of whether property damage was alleged which would fall within the policy coverage" were "separate questions." *Id*. at 41-82. Because subcontractor work was not at issue, the Court agrees that *Advance Roofing* does not specifically hold that *subcontractor* faulty workmanship is not an occurrence. But the Court does not agree with Dorn that the subsequent removal of "business exclusions" from CGL Policies is a material distinction between *Advance Roofing* and the present case.

### b. *Lennar*

Dorn next argues that the *Lennar* court "did not address the specific question of whether a subcontractor's faulty workmanship standing alone would be an occurrence because it already found coverage for resultant damages." (Doc. 168 at 16.) The Court does not agree. In *Lennar*, as in the present case, an insured developer oversaw the construction of a housing development in which the subcontractor performed the work. 214 Ariz. at 258 ¶ 2. Two insurers ultimately filed a declaratory relief action. The *Lennar* opinion specifically states, "[w]hile faulty construction does not constitute an occurrence, damage to the property resulting from faulty work may constitute an occurrence." *Id*. at 262 ¶ 17 (cleaned up). The court also cited *Advance Roofing*, which "itself draws a distinction between faulty workmanship standing alone and faulty workmanship that causes damage to property," and concluded that the plaintiffs did "not claim faulty work alone; they also claim that property damage resulted from the faulty work. This is sufficient to allege an occurrence under the policies issue." *Id*. at 262 ¶ 20. Contrary to Dorn's argument, the

*Lennar* court did, in fact, address whether faulty workmanship by a subcontractor, standing alone, could constitute an occurrence, and concluded that it could not.

Dorn also states that *Lennar* held that subcontractor faulty workmanship is "accidental." Dorn maintains that this supports its argument that faulty subcontractor workmanship alone can be an occurrence. The Court does not agree with this interpretation. As noted, an "occurrence" is as "*an accident*, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 1 at 6 ¶ 19, *et al.*) (emphasis added). It is true that the *Lennar* court stated, "[e]stablishing that the subcontractors intended to engage in faulty construction would not establish that Lennar intended for them to do so. Whether an event is accidental is evaluated from the perspective of the insured." *Lennar Corp.*, 214 Ariz. at 264. Nonetheless, this conclusion was in the context of determining whether the damages *resulting* from the subcontractor faulty work could be considered accidental. The *Lennar* case, as noted, specifically distinguishes between faulty workmanship and damage resulting from subcontractor faulty workmanship. *Id.* at 262 ¶ 17. This case does not, as Dorn argues, support a conclusion that subcontractor faulty work alone is an occurrence under the current CGL Policies.

### c.  Exclusion L

Finally, Dorn argues that the exclusion contained in section "L" of the CGL policies ("Exclusion L") also demonstrates that subcontractor faulty workmanship is covered. Exclusion L, also referred to as the "your work" exclusion, bars coverage for "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" The exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." (Doc. 168-4 at 6, *et al.*)  Dorn states that "the mere fact that a subcontractor exception exists is evidence of coverage." (Doc. 168 at 17.) USIC responds that Dorn misinterprets and overstates the application of Exclusion L. (Doc. 174 at 15.) The Court agrees with USIC.

In Arizona, "[i]ndividual clauses of an insurance policy must be interpreted in the context of the whole policy in order to give a reasonable and harmonious meaning and

effect to all its provisions." *Lukes v. Am. Family Mut. Ins. Co.*, 455 F. Supp. 2d 1010, 1014 (D. Ariz. 2006) (citation and quotations omitted). The Court cannot accept Dorn's argument because it would effectively nullify the insurance clause every time that a subcontractor allegedly performs faulty work for a contractor. As described above, claims predicated on faulty workmanship are not considered "occurrences" under Arizona law. *See, e.g., Advance Roofing*, 163 Ariz. at 482; *Lennar Corp.*, 214 Ariz. at 262 ¶ 17. Further, "exclusion clauses subtract from coverage rather than grant it." *Allstate Ins. Co. v. Heil*, No. CIV 07-00097 JMS/BMK, 2008 WL 68769, at *3 (D. Haw. Jan. 4, 2008) (citation omitted). The Court will not read coverage into the exclusion when Arizona law clearly does not provide it.

Dorn cites an Iowa case, *National Surety Corp. v. Westlake Inv., LLC*, 880 N.W.2d 724 (Iowa 2016), finding that "a reasonable ordinary person who read . . . [Exclusion L] in its entirety would believe it covered defective work performed by the insured's subcontractor unless the resulting property damage was specifically precluded from coverage by an exclusion or endorsement." *Id.* at 739. This Court is not bound by this decision, however, and it is not willing to effectively nullify Arizona case law every time that a contractor argues that a subcontractor performed faulty workmanship. The Court is instead persuaded by the multiple decisions to hold otherwise. *See, e.g, Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 2007 PA Super 403, ¶ 35 (2007) ("[The developer] argues that the exception to the 'your work' exclusion allows coverage to lie for claims based on faulty workmanship by a subcontractor. Yet, claims predicated on faulty workmanship cannot be considered 'occurrences' for purposes of an occurrence based CGL policy as a matter of plain language and judicial construction."); *Amerisure Mut. Ins. Co. v. Auchter Co.*, 673 F.3d 1294, 1310 (11th Cir. 2012) (because only faulty subcontractor work was at issue, "[t]he application of the 'your work' exclusion and its subcontractor exception thus has no impact on the outcome of this case").

The Court does not agree that its rejection of Dorn's interpretation renders the subcontractor exception to Exclusion L meaningless. Rather, the exception applies to

situations that are simply not present here. Should an insured perform "faulty workmanship to one part of a project (the roof, for example)," it could "lead to damage to another part of the project (such as stucco walls which may leak from faulty roof construction). In such an example, . . . the damage to the stucco walls would be 'property damage' within the meaning of the policy, but would ordinarily be excluded under the 'your work' exclusion, unless the stucco walls had been constructed by a subcontractor, in which case the damage could be covered by the subcontractor exception to the 'your work' exclusion." *Id*. (citing district court opinion). Such a situation is not present here, and the subcontractor exception to Exclusion L does not provide coverage in this case.

For all of these reasons, the Court declines to be the first to apply Arizona law and to hold that faulty subcontractor work, standing alone, constitutes an occurrence. Summary judgment is denied on this argument.

### 3.    *Desert Mountain*

Dorn also argues that its damages for "preventative measures" are covered under *Desert Mountain*, 225 Ariz. 194. It states that "all of Dorn's damages that constitute preventative measures are covered because they were necessary to prevent future damage to the homes that 'probably would have occurred' within the policy period." (Doc. 168 at 20.) In *Desert Mountain*, poorly compacted soil caused cracking and other damage to 50 new homes. *Id*. at 197. On appeal, the insurer, Liberty Mutual, challenged a jury instruction stating, "[t]he Liberty Mutual policies provide insurance coverage for the costs incurred to prevent possible future damage to non-defective property, if that damage probably would have occurred during the policy period if the preventative measures had not been performed." *Id*. at 210 ¶ 68. The insurer objected to this instruction as having no basis in the policies. In reviewing the jury instruction, the Court of Appeals noted that it would reverse "only if an erroneous instruction prejudiced the appellant's rights." *Id*. at 199 ¶ 11 (citing *Am. Pepper Supply Co. v. Fed. Ins. Co*., 208 Ariz. 307, 309, ¶ 7 (2004)).

In upholding the jury instruction, the *Desert Mountain* court distinguished between preventative measures alone and those made in conjunction with repairing damaged

property. The court rejected those cases cited by the insurer because "they involve situations in which the insured had not suffered any property damage before it took preventative measures or did not repair any damaged property, but paid *only* for preventive measures." *Id*. at 210 ¶ 69. In contrast, the court found that the Desert Mountain developer "proved it had suffered property damage covered by the policy separate and apart from the expenses relating to the measures the insurer argues were preventative." *Id*. at 210-11 ¶ 70. The court upheld the jury instructions "under these circumstances," citing a Pennsylvania case noting that "[i]t would be a strange kind of argument and an equivocal type of justice" to require an insurer to pay a much larger sum for the resulting damages, but not a smaller sum that could have prevented the damage. *Id*. at 211 ¶ 71 (citation omitted).

In addition, "[s]eparate from its attack on the jury instruction," the insurer also argued that the developer's actions "constituted repair of existing damage resulting from the soil settlement rather than prevention of future damage from soil settlement." *Id*. at 211 ¶ 73. As discussed at length in the parties' briefing herein, the homes were stabilized with "A" grout, "B" grout, and "C" grout. "A" grout was "performed to stabilize faulty soil compaction." The superior court ruled prior to trial that Desert Mountain could not recover "A" grout expenses because it "could not recover the costs of repairing defective workmanship." *Id*. at 211 ¶ 75. Desert Mountain did not appeal that ruling. The "B" and "C" grout "included the installation of soil nails, helical piers, steel rebar, ties and grout employed to repair and stabilize damaged retaining walls, stem walls and footings that had rotated, settled or moved due to faulty soil compaction" and "lock[ed] in place retaining walls, stem walls and footing that had been repaired with B grout," respectively. *Id*. at 211 ¶ 74.  The insurer argued on appeal that damages should not have been awarded for "B" and "C" grout because "that work also was directed at preventing future damage, not repairing existing damage." *Id*. at 211 ¶ 75. The Court of Appeals sided with the developer, citing testimony that "some of the 'B' and 'C' grout work lifted the affected structural components back into their correct positions, thereby repairing the components rather than (or in addition to) stabilizing them so they would incur no additional damage." *Id*. at 76.

Further, when lifting structures that had settled, the "B" and "C" grout work "could be classified as repair of resulting damage rather than a preventative measure." *Id*. Citing the "peculiar nature of the repairs," the Court of Appeals affirmed on grounds that it was "reluctant to hold that the jury erred by concluding that these measures constituted repairs of existing property damage rather than measures designed to prevent damage that might occur after the policies terminated." *Id*. at 212 ¶ 77.

The Court finds that Dorn overstates the *Desert Mountain* holding to the extent it suggests that *any* preventative measures are necessarily covered expenses under the CGL Policies. Rather, preventative measures are covered under *Desert Mountain* when an insured proves it suffered covered property damage separate and apart from the expenses relating to the preventative measures. The Court is mindful that, as noted, *Desert Mountain* also provides that although faulty construction is not covered, "damage to other property caused by or resulting from the defect may be covered." *Id.* at ¶ 89. Taken together, Dorn must demonstrate that it suffered covered *resulting* damages (or other covered damages); only then will expenses also aimed at preventing future damage be covered under the CGL Policies and *Desert Mountain*. As described above, there is a genuine dispute regarding the existence (and extent) of covered resulting damages under the CGL Policies—a necessary precondition to finding coverage for preventative measures under *Desert Mountain*.

Further, the Court finds that the parties have presented a genuine dispute of material fact regarding the extent of preventative measures in this case. Dorn asserts that had the drainage issues had not been resolved, "then foundation edge uplift would have worsened or at least continued to occur, causing worse or at least continued damage to the interior of the homes." (Doc. 168 at 20.) It cites testimony to that effect, including Mr. Ground's deposition testimony that "[i]f we wouldn't have gone in and taken care of [the repairs], we believe the edge lift would have continued to get worse, and then the resultant cracks inside the house, the grout, doors not being able to open would have become worse." (Doc. 168-3 at 67.) Dorn also presents testimony from Curt Peterson that "we weren't just making repairs to construct faulty workmanship because it was faulty workmanship. It was – We

did it because it was causing problems and it was causing resulting damage. And so we did it to correct that and also to correct the future problems." (*Id.* at 135.) Dorn states that the same is true with respect to the truss uplift issues and the unvented foam insulated roof system. (*Id.*)

USIC, for its part, asserts that the remedial measures in the present case are analogous to the "A" grout in *Desert Mountain*, for which there was no coverage: "In both cases, the repairs were made to repair faulty workmanship. In both cases, the repairs did not repair the resulting damage." (Doc. 174 at 20.) USIC also cites deposition testimony from Mr. Peterson in which he stated that the "A" grout measures in *Desert Mountain* (as described by counsel) and the grading and drainage repairs at Quailwood were "realistically" the same thing. (Doc. 174-2 at 47-48.) In addition, when asked whether he agreed that "whenever faulty workmanship is corrected, a byproduct of that corrected faulty workmanship is the reduction or prevention of future damage," Mr. Peterson responded, "Most of – Most of the time, yes. Yeah. Of course." (Doc. 174- at 52.) The Court accordingly finds a genuine dispute of material fact regarding the existence and scope of preventative measures in this case.

### 4.    Exclusions

Dorn also argues that various exclusions to the CGL Policies, cited by USIC in its complaint as barring coverage, do not apply in this case. The Court will address the exclusions in turn.

#### a.    Exclusions J(5) and J(6)

Exclusions J(5) and J(6) provide that the CGL Policies "do[] not apply" to "property damage" to:

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
> (6) That particular part of property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Doc. 168-4 at 5-6, *et al.*) The parties agree that these exclusions only apply to claims arising from ongoing operations. *See Sunwestern Contractors Inc. v. Cincinnati Indem. Co.*, 390 F. Supp. 3d 1009, 1018 (D. Ariz. 2019) (the J(5) and J(6) exclusions "only preclude damage to work that was not yet completed, or still in progress"). Dorn argues that the J(5) and J(6) exclusions do not apply to prevent coverage in this case because "[a]ll the underlying losses or damages here arose after construction on each affected residence in Quailwood was completed." (Doc. 168 at 21.) USIC responds that construction was not completed on at least four of the lots at issue until 2017. It cites an unlabeled exhibit noting that two of the homes had a "COE" date in February 2017, one in November 2017, and one in February 2018. (Doc. 174 at 23.) USIC also asserts that Mr. Grounds, CEO of Dorn, suggested in his deposition that damage to the homes may have begun in 2016.

The Court is not convinced by USIC's objections. As Dorn emphasizes, the J(5) and J(6) exclusions only preclude coverage for "work in progress." (Doc. 168 at 21.) USIC has not provided any particular evidence, other than speculation, that damage may have occurred to the four homes prior to their completion. Dorn also provides its own internal records demonstrating that the four homes at issue were, in fact, completed by April 2017. (Doc. 177-2 at 3-14.) Further, Mr. Grounds stated that Dorn noticed damage beginning in May of 2017. (Doc. 174-1 at 9-10.) Beyond that, he could only "speculate" as to when the damage actually began to occur. (*Id*. at 11.) The Court also notes that USIC previously conceded that the J(5) and J(6) exclusions were not at issue in this case (Doc. 93 at 11 n.1), as did its claims handler, Mr. Fisher, and its Rule 30(b)(6) corporate representative, Thomas Brown. (Doc. 168-2 at 114-115; 143-44). For these reasons, the Court does not find that USIC has presented a genuine dispute of material fact. Dorn is entitled to summary judgment on the J(5) and J(6) exclusions, which do not apply to this case.

### b.    Exclusion K

Exclusion K states that the CGL Policies "do[] not apply" to "'property damage' to 'your product' arising out of it or any part of it." (Doc. 168-4 at 6, *et al.*) In pertinent part, "your product" means "[a]ny goods or products, other than real property, manufactured,

sold, handled, distributed or disposed of by: You . . . ." (*Id.* at 9.) Dorn argues that Exclusion K does not apply because the "real property" exception to the exclusion applies. It asserts that it is "undisputable" that Dorn developed real property and improvements or fixtures that became part of that real property in Quailwood. (Doc. 168 at 23.)

USIC responds that there is a genuine issue of material fact regarding damage to the decorative landscaping gravel that Dorn ultimately replaced with granite. (Doc. 174 at 24.) USIC states that because the rock was "sold by Dorn to its homeowners," it therefore qualified as "your product." Further, USIC claims that the decorative rock did not fall under the "real property" exclusion because it was not part of any structure or affixed to land. (*Id.*) The Court does not agree that USIC has presented a genuine dispute of material fact with respect to either of these points.

First, as to whether Dorn sold the rock to homeowners, USIC cites deposition testimony in which Mr. Grounds stated, when asked about the landscaping gravel, that a "subcontractor would have purchased it." (Doc. 174-1 at 12.) He also stated that the gravel type was recommended by the landscaper. (*Id.*) Further, when Dorn "offered landscaping packages at Quailwood a customer would pick a package and then Dorn Homes would hire a subcontractor to install the package and, to the best of my knowledge, the subcontractor would purchase the gravel." (*Id.* at 13.) This testimony does not establish that Dorn provided the decorative rock to customers, and USIC cites no other support for this position.

Second, the Court does not agree with USIC's assertion that the decorative rock falls outside of the "real property" exception to Exclusion K. Under Arizona law, "real property" is defined as "all lands, including improvements and fixtures thereon. . ." Ariz. R. Stat. § 12-1141(6). The Court does not have difficulty in determining that decorative gravel landscaping constitutes an "improvement," if not a "fixture," to land, and therefore qualifies under the 'real property' exception to Exclusion K. *See also Sunwestern Contractors Inc.*, 390 F. Supp. 3d at 1017 ("[T]he Court construes the common-sense definition of 'real property' to encompass land and any buildings or permanent fixtures

erected upon that land, such as a house. In most ordinary residential real estate transactions, a buyer purchases a home, the fixtures in that home, and the land on which the home is located."). As USIC has provided no other objection, Dorn is entitled to summary judgment. Exclusion K does not bar coverage in this case.

### c.   Exclusion M

Dorn also argues that "Exclusion M" does not bar coverage because neither "impaired property" nor "uninjured property" is at issue. Exclusion M states:

> This insurance does not apply to:
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

The term "impaired property" is defined as:

> [T]angible property, other than "your product" or "your work", that cannot be used or is less useful because:
> a.      It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
> b.      You have failed to fulfill the terms of a contract or agreement;
> if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

This exclusion is commonly called the "impaired property" exclusion, and is "included in a policy to prevent the insured from claiming economic losses resulting from the insured's work or work product." *Transcon. Ins. Co. v. Ice Sys. of Am., Inc.*, 847 F. Supp. 947, 950 (M.D. Fla. 1994). The Court agrees with the previous courts to find that Exclusion M is

"ambiguous, 'confusing,' 'complex,' 'difficult to apply,' 'tricky,' and/or 'complicated'" drafting. *Washington Energy Co. v. Century Sur. Co.*, 407 F. Supp. 2d 680, 692 (W.D. Pa. 2005). Nonetheless, "Exclusion 'm' applies in a situation where, for example, the insured's work is incorporated into other property and that other property is not able to be used because of a defect in the insured's work." *Fid. & Deposit Co. of Maryland v. Hartford Cas. Ins. Co.*, 189 F. Supp. 2d 1212, 1225 (D. Kan. 2002).

USIC objects to summary judgment because it states that a question of fact exists as to any landscaping done by a homeowner. The rationale is that this landscaping may constitute "impaired property" because it was not Dorn's work. USIC cites testimony that there "could have been" "not that many" homeowners that installed some of their own landscaping. (Doc. 174-1 at 14.) USIC also states, without citation, that the grading performed by Dorn's subcontractors "may have caused damage or negatively affected" the landscaping installed by the Quailwood homeowners.[6] (Doc. 174 at 25.)

To apply, Exclusion M would require property damage, caused by Dorn's work, to impaired property or property that had not been physically injured. As one illustrative example, the Seventh Circuit found that Exclusion M applied where, "Sokol's peanut butter paste is 'your product' under the terms of the policy, and this product was incorporated into property 'other than your product,' that is, Continental's cookie mix. It is undisputed that the paste became defective, deficient, or inadequate." *Sokol & Co. v. Atl. Mut. Ins. Co.*, 430 F.3d 417, 423 (7th Cir. 2005). USIC has not presented a genuine dispute of material fact that a similar circumstance existed in this case. "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996). The Court finds that USIC's objections do

---

[6] USIC also states that in the course of performing repairs, Dorn "removed landscaping" installed by homeowners to complete the repairs. (*Id.*) The actual testimony cited, however, states that Dorn "tried to avoid" removing any landscaping in completing repairs, but that, as one example, a homeowner had installed fake grass that Dorn "literally just rolled it back, regraded underneath it, and then rolled it back with a positive slope. So stuff like that." (Doc. 174-2 at 43-44.)

not rise above the level of allegation or speculation. Dorn is entitled to summary judgment on Exclusion M, which does not apply in this case.

### B.  USIC's Motion (Doc. 169)

In its Motion for Partial Summary Judgment, USIC argues that it has no obligation to indemnify Dorn for costs incurred to repair faulty workmanship; that is has no duty to indemnify related "get-to" costs; and that USIC is not liable for punitive damages. As with Dorn's motion, genuine issues of material fact preclude summary judgment to USIC on its faulty workmanship argument. The Court also finds that the parties have presented genuine disputes with respect to the "get-to" damages and issue of punitive damages.

#### 1.      Duty to Indemnify Faulty Workmanship

USIC argues that it is not required to indemnify Dorn for what USIC deems the "Corrective Measures." (Doc. 169 at 8.) USIC concedes that the CGL Policies cover $227,120.71 in property damage resulting from subcontractor faulty workmanship. It states that it either has paid, or is in the process of paying, Dorn for those costs and expenses. USIC argues that the remaining $2,914,847.00, however, was incurred to repair faulty workmanship itself, which is not covered under the CGL Policies. (*Id*. at 13.) This briefing largely mirrors that of Section B to Dorn's Motion (Doc. 168), discussed *infra*. For the same reasons as discussed above, the Court finds that genuine disputes of material fact preclude summary judgment with respect to coverage of allegedly faulty subcontractor workmanship. As that part of Dorn's motion is denied, so too it is with respect to USIC.

#### 2.      "Get To" Costs

USIC also argues that the costs to "get to" the faulty workmanship are not covered by the CGL Policies. "[C]osts incurred in 'getting to' the damage are called 'get-to' costs." *Am. Family Mut. Ins. Co. v. Wilkinson Family Revocable Tr. dated Apr. 10, 1997*, No. CV-10-00345-PHX-ROS, 2012 WL 12507658, at *4 (D. Ariz. June 1, 2012) (citing *Desert Mountain*, 236 P.3d at 441–42, ¶ 91–92.)  Courts look to whether the costs are to "get-to" covered damages to determine whether the "get-to" costs are covered. *Id.* at *4 (citing *Desert Mountain*, 236 P.3d at 441–42, ¶ 91–92.) "Thus, faulty workmanship or getting to

faulty workmanship is not covered, but resulting damage or getting to resulting damage is covered." *Id.* at *5.

USIC argues that in performing the grading and draining measures, Dorn "damaged several aspects of non-defective work" including, "but not limited to, landscaping (including plants and shrubs), hardscape, pavers, gravel, irrigation systems and/or other ground cover." (Doc. 169 at 21.) Dorn concedes that it removed some ground cover and landscaping to expose the soil before regrading, but when regrading was complete, "the ground cover and landscaping were placed back." (Doc. 173 at 11) Nonetheless, Dorn argues that because the underlying damages associated with the foundation edge lift or other issues to the homes were covered expenses, any "get-to" expenses are also covered by the CGL Policies.

Whether any "get-to" expenses are covered by the CGL Policies rests on whether the underlying expenses were covered expenses. Given that the Court has denied summary judgment to both parties on this issue, it must also deny summary judgment with respect to the "get-to" damages. This portion of USIC's motion is denied.

### 3.       Punitive Damages

USIC also argues that it is entitled to summary judgment on Dorn's punitive damages claim because its alleged conduct, even if true, fails to rise to the level necessary to award punitive damages. The Court agrees with Dorn that, based on the remaining claims and factual allegations, a reasonable juror could find evidence of punitive damages.

Dorn seeks punitive damages in connection with its counterclaims for bad faith, fraud/misrepresentation, negligent misrepresentation, and breach of fiduciary duty. (Doc. 10 at 20, 22, 24.) In Arizona, an insured may recover punitive damages on a showing of "something more than the conduct necessary" to establish the tort of bad faith. *Rawlings v. Apodaca*, 151 Ariz. 149, 162 (1986) (finding that "plaintiff must prove that defendant's evil hand was guided by an evil mind") (citation omitted). An "evil mind" may be found where the insurer either intended to injure the insured or where the insurer "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm

to others." *Id.* To obtain summary judgment on the punitive damages issue, an insurer must show that no reasonable jury could find the requisite evil mind by clear and convincing evidence. *Holy Trinity Greek Orthodox Church v. Church Mut. Ins. Co.,* 476 F.Supp.2d 1135, 1140 (D. Ariz. 2007) (citation omitted).

The parties devote extensive briefing to the issues and factual circumstances surrounding whether USIC's conduct rose to the level of punitive damages. The Court does not feel it necessary to wade into all of those factual disputes here. Under Arizona law, "[f]raud will suffice" to demonstrate punitive damages. *Farr v. Transamerica Occidental Life Ins. Co. of California*, 145 Ariz. 1, 8 (Ct. App. 1984). As Dorn notes, USIC did not move for partial summary judgment on Dorn's counterclaims for fraud and misrepresentation. (Doc. 173 at 15; Doc. 10 at 20-24.) Those claims remain. The Court is therefore unable to see how there could not be a genuine dispute as to whether USIC acted fraudulently. As examples in the record, Dorn notes that USIC, through claims adjuster Mr. Fisher, indicated that it intended to do "everything" it could to try to prevent a class action lawsuit by Quailwood homeowners. (Doc. 173-2 at 55.) Mr. Fisher also "check[ed] in on the status of the repairs" with Dorn multiple times. (Doc. 168-3 at 138.) Ellen Carpenter of Dorn also testified that Mr. Fisher told her that "the faste[r] I get that information, the sooner I can get you paid." (Doc. 173-2 at 145.) With that background, Dorn proceeded with the numerous repairs to the homes. As thoroughly indicated in the parties' briefing, however, USIC's position is now that that Dorn is not entitled to recover most of its expenses.

USIC also did not move for summary judgment on Dorn's bad faith claim. That claim, too, remains. This also supports a denial of summary judgment on punitive damages. *See Nikfikr v. Am. Family Mut. Ins. Co*., No. CIV-03-0924-PHX-MHM, 2006 WL 8441007, at *2 (D. Ariz. Jan. 17, 2006) (denying summary judgment on punitive damages claim "based upon the overlapping evidence addressing Plaintiff's bad faith and punitive damages claims."); *See Wood v. Liberty Mut. Fire Ins. Co*., No. CV-11-2380-PHX-GMS, 2012 WL 2798761, at *6 (D. Ariz. July 9, 2012) ("Coupled with the bad faith claim, these

allegations [regarding claims processing and valuation practices] could lead a reasonable jury to infer Defendant possessed the 'evil mind' required for punitive damages. Summary judgment on the punitive damages claim is, therefore, not warranted."). The Court finds that there is reasonable evidence from which a jury could conclude that USIC either intended to injure Dorn, or acted knowing that it created a substantial risk of harming Dorn. The Court therefore denies summary judgment to USIC on the issue of punitive damages.

### C. Motion to Exclude Expert (Doc. 147)

Also before the Court is Dorn's motion to exclude the opinion of USIC's rebuttal expert, Steven Plitt, under Federal Rule of Evidence 702 and *Daubert*, 509 U.S. 579. (Doc. 147.) The motion will be granted in part and otherwise denied without prejudice.

#### 1. Fed. R. Evid. 702 and *Daubert* Legal Standard

When a party seeks to offer an expert opinion, the party must show that the expert's opinion satisfies the requirements set forth by Federal Rule of Evidence 702. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Trial judges must make a preliminary assessment on whether expert testimony is admissible. *See Daubert*, 509 U.S. at 589. "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* The Rule 702 inquiry is "flexible" and its "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95.

The party offering expert testimony must show that it is admissible under Rule 702.

1    *Lust v. Merrell Dow Pharm., Inc*., 89 F.3d 594, 598 (9th Cir. 1996). The requirements set

2    by Rule 702 are conditions for determining whether expert testimony is admissible. Thus,

3    Federal Rule of Evidence 104(a) requires that the party offering the expert testimony show

4    that the expert testimony is admissible under Rule 702 by a preponderance of the evidence.

5    See Fed. R. Evid. 104(a); *Daubert*, 509 U.S. at 592-93 & n.10; *Bourjaily v. United States*,

6    483 U.S. 171, 175–76 (1987).

7                    **2.     Discussion**

8             Among other claims, Dorn filed a counterclaim for breach of the duty of good faith

9    and fair dealing against USIC. (Doc. 10 at 17.) Dorn identified John M. Beringer, Jr. as an

10   expert witness. USIC designated a rebuttal expert witness, Steven Plitt, on or about October

11   16, 2019.[7] Mr. Plitt is an attorney, adjunct professor, and author focusing on insurance law

12   and, specifically, the implied covenant of good faith and fair dealing. (Doc. 147-1 at 2.)

13            Dorn first argues that Mr. Plitt's report should be excluded as containing "legal

14   opinions about the policies at issue, USIC's claims, Dorn's defenses, and [counsel's]

15   advice to USIC." (Doc. 147 at 4.) Dorn objects to what it characterizes as Mr. Plitt's legal

16   conclusions regarding coverage under the CGL Policies, including, "there co-existed both

17   covered and uncovered damages with associated covered and uncovered remediation

18   obligations," (*id*. at 37) and "[t]his was a fairly straightforward [construction defect] case

19   which involved covered and uncovered aspects of the claims." (*Id*. at 39.) Mr. Plitt's report

20   also states that Mr. Beringer's "reading of the [*Desert Mountain*] case would be incorrect

21   in my opinion," and then describes why. (*Id*.)

22            An expert witness "cannot give an opinion as to [his] *legal conclusion*, i.e., an

23   opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law

24   is the distinct and exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info.*

25   *Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (emphasis in original; quotation marks and

26   citation omitted). "Accordingly, federal courts typically prohibit lawyers, professors, and

27   ────────────────
     [7] Dorn argues that USIC's disclosure of Mr. Plitt was untimely because rebuttal reports
28   were due on September 20, 2019. (Doc. 147 at 2.) The Amended Case Management Order
     in this case states that the deadline for rebuttal experts was October 18, 2019. The
     disclosure was timely. (Doc. 32 at 3.)

other experts from interpreting the law for the court or from advising the court about how the law should apply to the facts of a particular case." *Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1042 (D. Ariz. 2005). Mr. Plitt's report acknowledges this principle, stating, "it is not my intent to offer legal opinions. Questions of law are to be decided by the trial court and not experts." (Doc. 147-1 at 37.)

While an expert witness may not opine on a legal conclusion, expert testimony concerning an ultimate issue of law "is not per se improper." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citation omitted). In *Hangarter*, also involving an insurance bad faith claim, the Ninth Circuit held that an expert's testimony did not address an ultimate issue of law because the expert "never testified that he had reached a legal conclusion that [d]efendants actually acted in bad faith (i.e., an ultimate issue of law)." *Id.* at 1016–17. Rather, the expert opined only that the defendants had "deviated from industry standards"—a factual question. USIC argues that here, similarly, Mr. Plitt is "not offering his opinion on the ultimate issue of fact, i.e. that USIC did not act in bad faith." (Doc. 164 at 11.) Rather, Mr. Plitt's opinions describe how USIC "complied with industry standards and practice." (*Id.*)

The "line between an opinion that is a legal conclusion that addresses an ultimate issue of law and one that merely embraces a legal conclusion is not always a clear one." *IceMOS Tech. Corp. v. Omron Corp.*, No. CV-17-02575-PHX-JAT, 2019 WL 4750129, at *11 (D. Ariz. Sept. 30, 2019). In the bad faith context, "[b]oth Arizona law and Ninth Circuit law recognize that experts in the area of insurance claim handling are proper, that they may testify regarding the application of industry standards to claim handling, and that they may refer to legal precedent to the extent necessary to explain the facts of their opinions." *Temple v. Hartford Ins. Co. of Midwest*, 40 F. Supp. 3d 1156, 1161 (D. Ariz. 2014) (citations omitted). Further, an expert may refer to the law in expressing an opinion without crossing the line into a legal conclusion. However, mere "legal conclusions without underlying factual support . . . constitute 'unsupported speculation' and are therefore inadmissible." *Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*, 371 Fed.

1    Appx. 719, 720 (9th Cir.2010) (quoting *Daubert*, 509 U.S. at 590).

2           Here, the majority of Mr. Plitt's report—the first 35 of 40 pages—is devoted to Mr.

3    Plitt's qualifications, review methodology, and overview of the claim file. The Court does

4    not find good cause to exclude that portion of his report. Further, the Court agrees with

5    USIC that, in significant part, the remaining pages describe Mr. Plitt's opinion of why and

6    how USIC complied with industry practices. (*See, e.g.,* Doc. 147-1 at 38 ("The appointment

7    of defense counsel was not required by the policy at that point, nor was the appointment of

8    pre-litigation counsel typical with respect to industry norms, standards, and practices. In

9    that regard, Mr. Fisher went above industry standards and practices."); *id.* ("[I]n my

10   experience the pre-litigation investigation performed by NCS was reasonable, appropriate

11   under the circumstances, and consistent with industry norms, standards, and practices

12   within the construction defect context."); *id.* at 39 ("[W]ith the exception of the deductible,

13   the [Reservation of Rights] letters were appropriate under the circumstances and complied

14   with industry norms, standards, and practices.")).

15          However, the Court also finds that certain portions of Mr. Plitt's report provide his

16   opinion on ultimate issues of law. *Nationwide Transp. Fin.*, 523 at 1058. Most notably, the

17   Court is concerned about Mr. Plitt's discussion of *Desert Mountain*, 225 Ariz. 194, in

18   paragraph 4 of the "Summary of Opinions," as well as his statement in paragraph 2 that

19   "there co-existed both covered and uncovered damages with associated covered and

20   uncovered remediation obligations" in this case. (Doc. 147-1 at 37.) The Court also finds

21   that Mr. Plitt has presented impermissible legal conclusions in paragraph 7 by stating,

22   "[t]his is a fairly straightforward [construction defect] case which involved covered and

23   uncovered aspects of the claims" and that it was "reasonable for Mr. Fisher/NCS and USIC

24   to conclude" that costs for "get-to damages" and "defective work itself" were "not covered

25   under the policy." (*Id.* at 39, 41.) The Court is mindful of USIC's position that Mr. Plitt's

26   report does not directly opine on whether USIC committed bad faith. Nonetheless, it cannot

27   be said that these issues are "ancillary to the ultimate issue" in this case. *Hangarter*, 373

28   F.3d at 1017. The interpretation of *Desert Mountain* is directly at issue in this case, as is

the extent of covered damages. The Court will therefore exclude these portions of Mr. Plitt's report and prohibit him from testifying to such matters.

Dorn also argues that Mr. Plitt's testimony will be confusing to the jury. (Doc. 147 at 8.) A court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . misleading the jury[.]" Fed. R. Evid. 403. The Court agrees that it would be confusing for an expert witness to testify as to the legal conclusions identified above, given that "[r]esolving doubtful questions of law is the distinct and exclusive province of the trial judge." *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993). Otherwise, the Court does not perceive danger in permitting USIC to present the remainder of Mr. Plitt's report and testimony to the jury.

## V.     CONCLUSION

Accordingly,

**IT IS ORDERED** granting in part and denying in part Defendant Dorn Homes, Inc.'s Motion for Partial Summary Judgment (Doc. 168). The Motion is granted with respect to Exclusions J(5) and (6), K, and M of the CGL Policies (*id*. at 21–26), which do not bar coverage in this case. It is denied in all other respects.

**IT IS FURTHER ORDERED** denying United Specialty Insurance Company's Notice of Motion and Motion for Partial Summary Judgment (Doc. 169).

**IT IS FURTHER ORDERED** that Defendant Dorn Homes, Inc.'s Daubert Motion to Exclude Opinion of Steven Plitt Under Rule 702 and *Daubert* (Doc. 147) is granted to the extent that USIC is precluded from offering portions of Mr. Plitt's report or testimony containing legal opinions as to coverage in this case, including interpretation of *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.,* 225 Ariz. 194, 200 ¶ 14 (App. 2010). This includes paragraph 4 of the "Summary of Opinions" in Mr. Plitt's report, as well as portions of paragraphs 2 and 7 as described herein. The motion is otherwise denied without prejudice to Dorn's objection to specific portions of Mr. Plitt's report or testimony at trial.

**IT IS FURTHER ORDERED** denying oral argument on the present motions.[8] The oral argument currently scheduled for August 6, 2020 is hereby vacated.

**IT IS FURTHER ORDERED** denying as moot the Stipulation to Reset Oral Argument on Cross Motions for Summary Judgment (Doc. 182).

**IT IS FINALLY ORDERED** setting a trial-setting conference on **Monday, August 24, 2020 at 2:00 PM** in Courtroom 504. Counsel may appear in person or telephonically. The parties will receive call-in instructions via email to participate by phone. Parties appearing in person shall follow the Court's guidelines for social distancing. Participants shall have their calendars available and be prepared to schedule dates for a Final Pretrial Conference and for trial.

Dated this 4th day of August, 2020.

Michael T. Liburdi
United States District Judge

---

[8] Both parties have submitted legal memoranda and oral argument would not have aided the Court's decisional process. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *see also* LRCiv 7.2(f); Fed. R. Civ. P. 78(b).